Mary L. CRAVEN, Plaintiff,

v.

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE—INSTITUTIONAL DIVISION, et al., Defendants.**

No. CIV.A. 3:99–CV–1349L.

United States District Court,
N.D. Texas,
Dallas Division.

May 30, 2001.

Ronald E. Harden, Harden Law Office, Terrell, TX, for plaintiff.

John Cornyn, Atty. Gen. of Texas, Andy Taylor, Frist Assist. Atty. Gen., Michael T. McCaul, Deputy Atty. Gen. for Criminal Justice, Phillip E. Marrus, Chief, Law Enforcement Defense Div., Cari G. Bernstein, Assist. Atty. Gen., Office of Texas Atty. Gen., Austin, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are Defendants' Motion for Summary Judgment, filed September 1, 2000; Defendants' Motion to Stay Order to Mediate, filed September 12, 2000; Plaintiff's Motion for Approval and Appointment of Mediator, Motion to Extend Deadline for Conducting Mediation, and Motion for Sanctions (hereinafter "Motion re: Mediation"), filed September 29, 2000; Defendants' Motion to Stay Revised Scheduled Order, filed May 1, 2001; Defendants' Motion for Leave to File Pretrial Order Out of Time, filed May 2, 2001; and Defendants' Motion to Exclude Evidence, filed May 2, 2001.

After careful consideration of the motion, response, reply, briefs, evidence submitted by the parties, and applicable law, the court **grants** Defendants' Motion for Summary Judgment. The court **denies,** with respect to the request for sanctions, and **denies as moot,** with respect to all other requested relief, Plaintiff's Motion re: Mediation, and **denies as moot** Defendants' Motion to Stay Order to Mediate, Motion to Stay Revised Scheduled Order, Motion for Leave to File Pre-trial Order Out of Time, and Motion to Exclude Evidence.

### I. *Factual and Procedural Background* [1]

Plaintiff Mary L. Craven ("Craven") was employed by Defendant Texas Department of Criminal Justice ("TDCJ") [2] in April

---

1. The facts contained herein are either undisputed or, where they are disputed, presented in the light most favorable to Plaintiff as the nonmovant.

2. Craven names as Defendants the TDCJ, Texas Department of Criminal Justice—Institutional Division ("TDCJ–ID"), and Texas Department of Criminal Justice—State Jail Divi-

1995 as a Correctional Officer at the Hutchins State Jail Facility in Dallas, Texas. In August 1997, Craven was a Correctional Officer III assigned to the third shift (from 10:00 p.m. until 6:00 a.m.) in "D" building, which housed inmates assigned to the Substance Abuse Therapeutic Program ("SATP"). SATP offenders were segregated from the remaining prison populace, and attended drug counseling on a full-time basis. Working with the SATP offenders required more skill and training than other Correctional Officer positions.

During this time, there was an opening on the first shift (from 6:00 a.m. until 2:00 p.m.). Policy required a formal application for a shift transfer, but common practice was to accept an Inter–Office Communication ("IOC") detailing the applicant's qualifications. Applicants would then be interviewed for the position. On October 11, 1997, Craven submitted an IOC requesting transfer to the first shift in "D" building. No interviews were conducted, but another officer, Cheryl Jackson ("Jackson"), was selected for the opening on first shift, effective October 23, 1997. Jackson was at that time working on the second shift (from 2:00 p.m. to 10:00 p.m.) in "D" building. She had submitted an IOC on April 16, 1997, well before Craven's IOC, requesting a transfer to first shift. Jackson's request, however, specified a transfer to "K" building (which houses prisoners who are a danger to officers, other prisoners, or themselves; who present a risk of escape; or who are affiliated with a gang) rather than "D" building.[3] Craven is white; Jackson is African–American. The supervisor over the position in question reported to Major Allen Brown ("Brown"), also African–American. Accordingly to Craven, Brown guaranteed Jackson the position although she had not specifically requested "D" building and had not detailed her qualifications. Craven complained about the selection of Jackson for the vacancy and requested that she be assigned to the position instead. After her request was denied, she filed a grievance on October 24, 1997.

On October 29, 1997, Craven allegedly violated facility regulations by failing to maintain the security of the "picket" in

---

sion ("TDCJ–SJD"). Future references to "TDCJ" or "Defendant" are intended, unless the context indicates otherwise, to refer to all three Defendants collectively.

TDCJ *seems* to assert that it is not and was not Craven's employer: "Because Craven was, in fact, employed by the Hutchins State Jail, she cannot claim that she was subjected to race discrimination in connection with hiring by the Texas Department of Criminal Justice or its Institutional or State Jail Divisions." Defendants' Brief in Support of Motion for Summary Judgment at 6. It also implies that it contests the lawsuit because of the absence of an employment relationship, at least with respect to the Institutional Division: "Because Craven was never employed by the Texas Department of Criminal Justice—Institutional Division, TDCJ–ID has filed a Motion to Dismiss, which is pending before the Court." *Id.* at 6 n. 7. TDCJ's Motion to Dismiss, however, was denied by the court on February 23, 2000 and has not

been resubmitted. Because the employment relationship argument is not clearly advanced in the Motion for Summary Judgment, the court will not consider it and will assume without deciding for the purposes of the motion that Craven was employed by all three Defendants collectively at all times relevant to this lawsuit.

**3.** Jackson's request was submitted several months before the opening on first shift in the "D" building. Her specification of "K" building may have been because that was the only first shift opening at the time, rather than a preference for "K" building *per se.* It might have been reasonable, therefore, for management to infer that she would want *any* opening available on the first shift, including the one she eventually obtained. Craven seems to be reading too much into the designation of "K" building on Jackson's IOC.

"D" building—leaving it unlocked and allowing another correctional officer to sleep underneath a table in the control picket while she worked inside. She was charged with substandard duty performance and, after a disciplinary hearing during which she denied the allegation, received a written reprimand on November 12, 1997. Warden Elvis Hightower, an African–American, inquired about the status of her complaint over the shift transfer on the same day he imposed the discipline. As a result of the disciplinary action, she was moved from the SATP facility to working with "general population" inmates. As a result of the reprimand, however, she was not formally demoted and was subjected to no loss of pay, benefits, or other conditions and privileges of employment. She was subjected to various other alleged acts of harassment:

> She was variously assigned to mobile patrol, security gates, assisting in other areas in a security role, was given contradictory orders by supervising Sergeants and Lieutenants thus exposing her to further potential discipline, was subjected to invasion of her personal life by Lt. Smith, an African–American, and on the date of resignation, Defendants attempted to serve her with discipline after she had tendered her resignation.

Brief in Support of Plaintiff's Response at 4.

On January 7, 1998, approximately three months after her initial request, Craven was transferred to the SATP first shift after another vacancy opened up.[4] She subsequently filed charges with the Texas Commission on Human Rights and the Equal Employment Opportunity Commission ("EEOC"), on March 12 and March 17, 1998 respectively, alleging discrimination based on race and retaliation for complaining of such. An amended charge was filed on April 23, 1998. The charge cited, as the retaliation to which she was subjected, only the written reprimand of November 12, 1997. Craven resigned on August 14, 1998, asserting in an IOC that "the hostile working environment and constant retaliation towards me, makes it intolerable for me to continue employment with the Hutchins State Jail." Plaintiff's Response to Defendants' Motion to Exclude Evidence, Exhibit A.

After receiving a "right to sue" letter, Craven filed this lawsuit on June 14, 1999, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. She alleges discrimination based on race in the denial of her transfer request and retaliation for complaining of such. She was granted leave to amend her complaint on December 30, 1999 to add additional defendants. The only retaliatory incident mentioned in the original Complaint or her First Amended Complaint was the written reprimand of November 12, 1997. She alleges that the unlawful employment practices were committed intentionally and/or with malice. She seeks injunctive relief, compensatory damages (including back wages and damages for mental anguish and pain and suffering), and costs and attorney's fees.

## II. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file,

---

4. In her deposition, Craven stated that she was transferred directly from general population to first shift in the "D" building, after approximately three months assigned to general population. Defendants' Appendix at 14–16. An IOC dated January 7, 1998 announcing shift assignments (effective January 8, 1998) showed that Craven was assigned to first shift in the "D" building, but reflected that her current assignment was third shift in the "D" building rather than general population. Id. at 72.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas*, 136 F.3d at 458.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id., see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *Analysis*

### A. *Failure to Transfer*

 Craven asserts that the denial of her transfer request constituted discrimination based on race, in violation of Title VII:

It shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). Under the applicable burden-shifting paradigm for Title VII race discrimination claims, Craven must establish a prima facie case of discrimination; TDCJ must then articulate a legitimate, nondiscriminatory reason for its action; and finally, if the parties satisfy their initial burdens, the case reaches the "pretext stage" and Craven must then adduce sufficient evidence to permit a reasonable trier of fact to find pretext or intentional discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 425–26 (5th Cir.2000). The Fifth Circuit has stated:

> To establish a prima facie case of discrimination under Title VII, a plaintiff may prove her claim either through direct evidence, statistical proof, or the test established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* test requires the plaintiff to show: (1) she was a member of a protected class, (2) she was qualified for the position she lost, (3) she suffered an adverse employment action, and (4) that others similarly situated were more favorably treated.

*Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.), *cert. denied,* 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998); *see also Rutherford v. Harris County, Tex.,* 197 F.3d 173, 184 (5th Cir. 1999); *Ward v. Bechtel Corp.,* 102 F.3d

199, 202 (5th Cir.1997). *Urbano* and *Rutherford* are sex discrimination cases, but the same standard applies to race discrimination cases, as the statute was enacted to prohibit both kinds of discrimination.

■ At the pretext stage, "summary judgment is inappropriate if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that race was a determinative factor in the actions of which plaintiff complains." *Pratt v. City of Houston, Tex.,* 247 F.3d 601, 606–07 (5th Cir.2001) (internal quotation marks, brackets, and citation omitted). An employee may in some instances survive summary judgment with as little as her prima facie case of discrimination plus evidence contradicting the nondiscriminatory reason asserted by the employer, but that is not always enough. *Id.* at 606 (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The factors to be considered in determining whether a plaintiff has established a genuine issue of material fact with respect to pretext include " 'the strength of the prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered.' " *Id.* (quoting *Reeves* ).

■ TDCJ does not contest that Craven is a member of a protected class,[5] she was qualified for the transfer she sought, and the transfer went to someone not of the same protected class. TDCJ argues, how-

---

**5.** Title VII prohibits racial discrimination against whites as well as discrimination against racial minorities. *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 279–80, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Although some courts have required a heightened pleading standard in cases of reverse discrim-

ination (that is, discrimination against historically and socially favored groups such as whites), the Fifth Circuit does not do so. *See generally Ulrich v. Exxon Co., U.S.A., a Div. of Exxon Corp.,* 824 F.Supp. 677, 683–84 (S.D.Tex.1993) (collecting cases).

ever, that Craven has not established her prima facie case because she did not suffer an adverse employment action. Craven completely fails to address this argument in her response brief, focusing on the third stage of the *McDonnell Douglas* framework. After careful consideration, the court agrees with TDCJ that Craven has not met her burden at the first stage by establishing her prima facie case.

■ The court confesses some confusion and frustration as to the proper terminology for Title VII discrimination claims. The Fifth Circuit has established that the employer conduct that will satisfy a discrimination claim (42 U.S.C. § 2000e–2(a)) is broader than that which will satisfy a retaliation claim (42 U.S.C. § 2000e–3(a)). *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708–09 (5th Cir.), *cert. denied*, 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). The Fifth Circuit described employer conduct that will satisfy a Title VII retaliation claim as both an "ultimate employment decision" and an "adverse employment action," *id.* at 705–09, and apparently continues to use the terms interchangeably for Title VII retaliation claims. *See, e.g., Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875, 879–80 (5th Cir.1999). The Fifth Circuit also uses the term "adverse employment action," however, for Title VII discrimination claims. *Rutherford*, 197 F.3d at 184;

*Urbano*, 138 F.3d at 206; *Ward*, 102 F.3d at 202. Based on the distinction drawn in *Mattern*, "adverse employment action" evidently means one thing in the context of a Title VII discrimination claim and another in the context of a Title VII retaliation claim.[6] It may be that the Fifth Circuit considers "adverse employment action" to denote the broader range of conduct, of which the category "ultimate employment decisions" is a subset, and means merely that a retaliation claim must satisfy both, but that is hardly clear from the decisions. The court concludes that use of "adverse employment action" for both types of claims is potentially confusing and should be avoided. *Clarification by the Fifth Circuit and identification of different phrases to discuss the range of employer conduct implicated in the two different categories of claims would be helpful.* In the absence of such clarification, the court uses "adverse employment action" in discussing Craven's failure to transfer claim in the broader sense, to include any employer conduct sufficient to support a claim of Title VII discrimination.

■ Craven offers no summary judgment evidence of any difference between the night shift and the morning shift in pay, benefits, responsibilities or other terms, conditions, and privileges of employment. Accordingly, the court concludes that Craven's request was for a

---

**6.** This ambiguity may be an inevitable result of the Supreme Court's decision to establish precise requirements for Title VII discrimination claims tailored to specific fact patterns rather than a standardized formulation that would cover all cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."); *see also International Brotherhood of Teamsters v. United States*, 431

U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (the *McDonnell Douglas* pattern is not "the only means of establishing a prima facie case of individual discrimination" and did not "create an inflexible formulation"). Unfortunately, the lower courts may find it difficult to determine whether an appellate court considered a specified requirement, such as "adverse employment action," as a general requirement of all Title VII discrimination cases or as a requirement specific to that case which might be modified under a different fact pattern.

lateral transfer, changing only working hours. A prima facie Title VII discrimination case requires showing not just an employment action, but an *adverse* employment action. *Cf. Mattern,* 104 F.3d at 708–09 (Title VII discrimination provision encompasses ultimate employment decisions and lesser *"harms"*) (emphasis added). An employment action that is neutral or beneficial is insufficient to establish the prima facie case. That Craven expressed a preference for the day shift is insufficient to conclude that denial of her transfer request was an adverse action.[7] The court therefore must consider whether the difference in working hours *alone* suffices for an adverse action.

Most cases addressing whether a lateral transfer (or denial thereof) constitutes an adverse employment action for purposes of a Title VII discrimination claim have concluded that it does not, often despite differences between the two positions equal to or greater than involved here. *See, e.g., Sims v. Boeing Co.,* 215 F.3d 1337, 2000 WL 633228, at *1 (10th Cir. May 17, 2000) (unpublished) (transfer to the second shift); *Sanchez v. Denver Public Schools,* 164 F.3d 527, 532 (10th Cir.1998) (longer commute and insignificant alteration in job responsibilities); *Kindred v. Northome/Indus. Sch. Dist. No. 363,* 154 F.3d 801, 802–04 (8th Cir.1998) (assigning bus driver to longer school bus route without increase in pay), *cert. denied,* 525 U.S. 1109, 119 S.Ct. 881, 142 L.Ed.2d 781 (1999); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994) (different duties and more stressful job, but no reduction in title, salary, or benefits; "Changes in

duties or working conditions that cause no materially significant disadvantage, such as Harlston's reassignment, are insufficient to establish the adverse conduct required to make a prima facie case."); *Whitehead v. Norfolk Southern Ry. Co.,* 53 F.Supp.2d 1380, 1382–83 (M.D.Ga.1999) (transfer to different area of forwarding yard involved no change in hours, pay, benefits, or "off days"; only change was that gravel in one area was harder to walk on—"at most, a minor change in his work environment, which does not amount to an adverse employment action"); *Smith v. Schering–Plough Health Care Products, Inc.,* 6 F.Supp.2d 731, 734 (W.D.Tenn. 1997) (plaintiff conceded that transfer was not a demotion, and that he suffered no emotional injuries, serious stress, or ruined reputation); *Joiner v. Ohio Dep't of Transp.,* 949 F.Supp. 562, 567 (S.D.Ohio 1996) (no "loss of prestige or an objectively demeaning change of working conditions"; new title and "the loss of opportunity for overtime and the loss of supervisory responsibility" insufficient to constitute adverse employment action). When courts have held a lateral transfer to be an "adverse employment action," the position sought or lost has been objectively better in some respect. *See, e.g., Lulac Council 4433 & 4436 v. City of Galveston,* 979 F.Supp. 514, 518–19 (S.D.Tex.1997) (plaintiffs were transferred to less prestigious positions, which were clearly seen as demotions; other officers typically seek to be transferred out of, rather than into, the department to which plaintiffs were transferred).

▮ Courts have also frequently found that lateral transfers do not constitute an

---

7. Whether an employment action is "adverse" is an objective determination. "If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action." *Sanchez v. Denver Public Schools,* 164 F.3d 527, 532 n. 6 (10th Cir.1998); *see also Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1448–49 (11th Cir.1998) (Americans with Disabilities Act case).

"adverse employment action" in discrimination cases brought under the closely related Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* *See, e.g., Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) (lateral transfer insufficient to constitute adverse employment action even though it resulted in drastic reduction in commission income); *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 457 (7th Cir.1994) ("employee's salary, benefits, and level of responsibility would remain unchanged"; change in title and reporting relationship, and employee's negative perception of transfer, insufficient to show employment action was adverse); *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (loss of "assistant vice president" title, but no reduction in salary); *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 885–86 (7th Cir.1989) (longer commute and negative public perception).[8]

▬▬▬▬ The court finds these cases persuasive and concludes that to avoid

---

**8.** The issue of whether lateral transfers are adverse employment actions also frequently arises in connection with claims of retaliation, whether under Title VII, ADEA, or 42 U.S.C. § 1983. As noted above, retaliation claims involve a different standard than discrimination claims for what constitutes an "adverse employment action." The Fifth Circuit has established a higher standard for adverse employment actions to support a Title VII retaliation claim than that required for a Title VII discrimination claim. *Mattern,* 104 F.3d at 708–09. On the other hand, the standard for retaliation claims under § 1983 is lower than that for retaliation claims under Title VII. For example, reprimands are not "adverse employment actions" for purposes of a Title VII retaliation claim, but are for a § 1983 retaliation claim, *Sharp v. City of Houston,* 164 F.3d 923, 933 & n. 21 (5th Cir.1999), and arguably for a Title VII discrimination claim as well, *Lulac Councils,* 979 F.Supp. at 518.

Retaliation cases nevertheless provide further indirect support for a conclusion that a lateral transfer is not actionable unless it involves some non-trivial change that is objectively adverse. Courts have generally found an adverse employment action only when the circumstances involve a greater relative difference between the positions in question than that involved in this case. *See, e.g., Forsyth v. City of Dallas, Tex.,* 91 F.3d 769, 774 (5th Cir.1996) (§ 1983 retaliation; "positions were more prestigious, had better working hours, and were more interesting than night patrol. Moreover, few officers voluntarily transferred from the Intelligence Unit to night patrol and other officers had been so transferred as punishment."), *cert. denied,* 522 U.S. 816, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997); *Click v. Copeland,* 970 F.2d 106, 110 (5th Cir.1992) (§ 1983 retaliation; "jobs in the jail are not as interesting or prestigious as jobs in the law enforcement section"; " 'everybody' views a transfer from detention to law enforcement as a promotion"; also some evidence of lost seniority rights); *Collins v. State of Illinois,* 830 F.2d 692, 704 (7th Cir. 1987) (Title VII retaliation; "relegated to doing reference work instead of consulting"; no longer had private office, own phone, business cards, or listing in professional publications); *Florence v. Runyon,* 990 F.Supp. 485, 498 (N.D.Tex.1997) (Title VII retaliation; less desirable location, change in scheduled work hours, increased travel time, different duties). When the difference in positions was relatively minor, courts have generally held that a lateral transfer did *not* constitute adverse employment action for purposes of a retaliation claim. *See, e.g., Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 879–80 (5th Cir. 1999) (Title VII retaliation; same job title, benefits, duties, and responsibilities; longer commute was insufficient to make transfer adverse, as was transfer to "a less secure (but otherwise similar) position"; also noting "the clear trend of authority in other circuits holding that a purely lateral transfer is not an adverse employment action") (internal quotation marks and citations omitted); *Benningfield v. City of Houston,* 157 F.3d 369, 377 (5th Cir.1998) (§ 1983 retaliation; transfer to night shift; "Merely changing Benningfield's hours, without more, does not constitute an adverse employment action. A transfer may also constitute a demotion. However, the transfers in *Forsyth* and *Click* involved more than mere changes in working hours and are, therefore, distinguishable.") (citations omitted), *cert. denied,* 526 U.S. 1065, 119 S.Ct.

summary judgment on her failure to transfer claim, Craven must show that the position sought was objectively better than her position at the time, in some non-trivial way. As noted by the Seventh Circuit, such a requirement is a practical necessity:

> Obviously a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.

*Williams*, 85 F.3d at 274 (citations omitted); *see also Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1453 n. 21 (11th Cir. 1998) (Americans with Disabilities Act case; "It is important not to make a federal case out of a transfer that is *de minimis*, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint."). Title VII discrimination claims should be limited to

> a materially adverse change in the terms and conditions of employment [which] must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady*, 993 F.2d at 136.

The court concludes that Craven has not met her burden with respect to showing that denial of her transfer request was an adverse employment action. She has pointed to no difference between the two positions other than the working hours. Craven carries the burden of establishing her prima facie case, and she has supplied no competent summary judgment evidence that the first shift position was objectively "better" and that the denial of her transfer request therefore was "adverse." Accordingly, she has not established a genuine

---

1457, 143 L.Ed.2d 543 (1999). As noted above, these retaliation cases are not directly on point, but nevertheless are suggestive as to the circumstances under which a lateral transfer would be considered an adverse employment action.

Other frequently cited cases concluding that transfers or reassignments could be adverse employment actions are less persuasive, as they arose in a context other than summary judgment, *see, e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (§ 1983 retaliation, motion to dismiss; discussing a resulting long commute as an example of how a transfer *could* be adverse); *Sharp*, 164 F.3d at 933 (§ 1983 retaliation, affirming jury verdict; jury *could* have considered transfer to be equivalent to a demotion, "if the new position proves *objectively* worse—such as being less prestigious or less interesting or providing less room for advancement") (emphasis added); *Khan v. Cook County*, 1996 WL 432410, at *2 (N.D.Ill. July 30, 1996) (Americans with Disabilities Act retaliation claim, motion to dismiss; transfer to night shift *could* be more than minor change), or involved dicta not essential to the court's ruling, *see, e.g., Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (Title VII retaliation; "We note in addition that the transfer is just barely—if at all—characterizable as 'adverse' employment action: Steiner was not demoted, or put in a worse job, or given any additional responsibilities."), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). The court considers these cases to have little persuasive value here.

issue of material fact as to her race discrimination claim based on the failure to transfer. TDCJ therefore is entitled to judgment as a matter of law with respect to this claim.

TDCJ also argues that: 1) it has articulated a legitimate, nondiscriminatory reason for its denial of the transfer request, and Craven has no evidence of pretext; 2) the failure to transfer claim is moot, as Craven received a transfer before filing her EEOC charge and this lawsuit; and 3) Craven cannot establish damages. Based on the ruling that Craven has not established her prima facie case, the court need not address these additional grounds for summary judgment.

### B. *Retaliation*

 Craven further claims that she was retaliated against for complaining of racial discrimination, in violation of Title VII's anti-retaliation provision:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). "[T]he standard for evaluating a Title VII retaliation claim in a summary judgment context" requires the plaintiff to "first prove by preponderance of the evidence (1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Evans v. City of Houston,* 246 F.3d 344, 352 (5th Cir.2001) (citation and internal quotation marks omitted).[9] The same *McDonnell Douglas* burden-shifting framework applies. As with the failure to transfer claim, TDCJ argues that Craven has not demonstrated her prima facie case. Specifically, TDCJ asserts that Craven has submitted no evidence of an ultimate employment decision.

 The Complaint and First Amended Complaint allege no retaliatory conduct by TDCJ other than the November 12, 1997 written reprimand. In her deposition and response brief, Craven described various other acts of harassment as noted earlier. None of these suffices. "Title VII's anti-retaliation provision refers to *ultimate employment decisions,*" such as "hiring, granting leave, discharging, promoting, and compensating." *Mattern,* 104 F.3d at 707–08 (internal quotation marks and citation omitted) (emphasis added). Harassment and reprimands do *not* rise to the level of ultimate employment decisions, and thus cannot form the basis of a Title VII retaliation claim. *Id.* at 707–09. In her response brief, Craven argues that the harassment forced her to quit her job, and that this constructive discharge constituted an ultimate employment decision sufficient to support a retali-

---

9. As noted above, "adverse employment action" has a different meaning for a Title VII retaliation claim than it does for a Title VII discrimination claim. Although *Evans* uses that phrase to describe the prima facie case for a retaliation claim, the court uses "ultimate employment decision" (*Mattern*) instead in discussing Craven's retaliation claim, to minimize confusion.

ation claim. Assuming *arguendo* that Craven has submitted sufficient competent summary judgment evidence to establish a genuine issue of material fact whether she was constructively discharged, the court concludes that her retaliation claim is still insufficient, because she did not raise the question of constructive discharge earlier.

■■■ A condition precedent to bringing suit on any Title VII claim is the timely filing of an EEOC charge. *Young v. City of Houston, Tex.*, 906 F.2d 177, 179 (5th Cir.1990). The scope of a Title VII suit filed thereafter extends no further than the scope of the investigation that can reasonably be expected to grow out of the charge of discrimination. *Id.; Fine v. GAF Chemical Corp.*, 995 F.2d 576, 577–78 (5th Cir.1993); *Chester v. American Tel. & Tel. Co.*, 907 F.Supp. 982, 987 (N.D.Tex. 1994), *aff'd* 68 F.3d 470 (5th Cir.1995), *cert. denied*, 516 U.S. 1141, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996). It is not limited to the exact language of the EEOC charge, but neither does it extend beyond the investigation that would reasonably arise from that language.

Craven's EEOC charge drew the EEOC's attention to the issue of retaliation, but only in the context of a single written reprimand. Despite the fact that the amended EEOC charge was filed approximately five months after the written reprimand, no other instances of harassment or retaliation were included, and there was nothing on the form from which a reasonable person could infer that the retaliation was substantial enough to compel her resignation. *See* Defendants' Appendix at 88–90. Descrip-

tion of an extensive pattern of harassment might be sufficient to create such an inference, but description of a single written reprimand is not—such actions are not typically so intolerable as to compel resignation. In addition, Craven's resignation occurred approximately four months *after* the amended EEOC charge. *See Fine*, 995 F.2d at 578 (holding that events after the filing of the EEOC charge were beyond the scope of the EEOC investigation). Craven has offered no evidence: 1) that she amended her EEOC charge to assert that the retaliation encompassed constructive discharge;[10] or 2) that the EEOC investigation actually encompassed, or would reasonably be expected to encompass, such constructive discharge. The court further notes that Craven failed to mention constructive discharge, or for that matter any form of retaliation other than the written reprimand, either in her original complaint or amended complaint. The old maxim *expressio unius est exclusio alterius* springs to mind; Craven's allegation of one specific retaliatory act with no mention of other conduct or "constructive discharge" suggests that the written reprimand was, as late as November 23, 1999 when she moved for leave to amend her complaint, the only alleged "retaliation" upon which she based her claim. Under the *Young* standard, allegations of harassment and constructive discharge made during her deposition simply cannot expand the scope of her lawsuit.

Under these circumstances, the court concludes that the scope of the EEOC investigation could not reasonably be ex-

---

**10.** Craven asserts that she "filed her amended charge after her resignation." Plaintiff's Response to Defendants' Motion to Exclude Evidence (filed May 22, 2001) at 3. This assertion was *not* made in response to the motion for summary judgment, and Craven inexplicably provides no competent summary judgment evidence of such an amended charge. Unsubstantiated assertions are not competent summary judgment evidence. *Forsyth,* 19 F.3d at 1533. The court therefore does not consider the alleged post-resignation amended charge.

pected to include Craven's assertion that she was constructively discharged in retaliation for her complaint. Accordingly, her alleged constructive discharge is not within the scope of this lawsuit and cannot serve as the ultimate employment decision required for a prima facie case of retaliation. Because none of the other retaliatory actions she alleges is an ultimate employment decision, she has not demonstrated a prima facie Title VII retaliation case. Accordingly, she has not established a genuine issue of material fact with respect to her retaliation claim. TDCJ therefore is entitled to judgment as a matter of law on this claim.

## IV. *Other Motions*

In her Motion re: Mediation, Craven asserts that TDCJ refused to participate in mediation and improperly filed an "eleventh hour" Motion to Stay Mediation on September 12, 2000, less than three weeks before the mediation deadline of September 30, 2000. Craven requests that the court sanction TDCJ by awarding her fees and expenses related to filing the Motion re: Mediation and other efforts directed toward mediating the case. The court declines to impose the sanctions requested.

TDCJ's motion to stay mediation was predicated upon its belief that its motion for summary judgment, filed September 1, 2000, would "resolve all of the outstanding issues in their favor as a matter of law." Defendants' Motion to Stay Mediation at 2. Although the court sympathizes with Craven's frustration at TDCJ's refusal to participate in mediation, the court's ruling today suggests that TDCJ's desire to stay mediation while awaiting a ruling on the motion for summary judgment was not completely unreasonable. Even if TDCJ's resistance to mediation violated the standards promulgated in *Dondi Properties*

*Corp. v. Commerce Savings & Loan Ass'n,* 121 F.R.D. 284 (N.D.Tex.1988) (*en banc*), as Craven argues, the court cannot conclude that TDCJ's actions in this regard were so unreasonable as to warrant sanctions. The court therefore denies Craven's request for the imposition of sanctions. Because the court's ruling on the Motion for Summary Judgment disposes of all claims in this action, all other relief requested in pending motions is moot, and those motions are denied accordingly.

## V. *Conclusion*

For the above-stated reasons, Craven has not established a genuine issue of material fact as to either of her claims against TDCJ, and TDCJ is entitled to judgment as a matter of law as to all claims. TDCJ's Motion for Summary Judgment is therefore **granted**. All of Craven's claims are hereby **dismissed with prejudice**. The trial setting on the court's four-week docket starting June 4, 2001 is hereby **vacated**. Judgment will issue by separate document.

Craven's Motion re: Mediation is **denied** with respect to the request for sanctions and **denied as moot** with respect to all other requested relief. TDCJ's Motion to Stay Order to Mediate, Motion to Stay Revised Scheduled Order, Motion for Leave to File Pre-trial Order Out of Time, and Motion to Exclude Evidence are **denied as moot**.

## *JUDGMENT*

This judgment is entered pursuant to the court's memorandum opinion and order of May 30, 2001. It is therefore ORDERED, ADJUDGED, and DECREED that Plaintiff take nothing by her suit against Defendants, that all relief requested by Plaintiff is denied, that this action is hereby dismissed with prejudice, that all relief not expressly granted herein is de-

nied, ant that all allowable costs are taxed against Plaintiff.